**Max NISSON, Plaintiff–Counter–Defendant–Appellant–Cross–Appellee,**

v.

**Nell W. LUNDY, Defendant–Counter–Claimant, Appellee–Cross–Appellant.**

**No. 91–8730.**

United States Court of Appeals, Eleventh Circuit.

Oct. 21, 1992.

John G. Haubenreich, Atlanta, Ga., for plaintiff-counter-defendant, appellant-cross-appellee.

John L. Watson, Jr., Jonesboro, Ga., for defendant-counter-claimant, appellee-cross-appellant.

Before COX, Circuit Judge, CLARK, and WELLFORD *, Senior Circuit Judges.

PER CURIAM:

Defendant, Nell W. Lundy, sold all the shares of common stock in Martin & Jones, a Georgia corporation, to plaintiff, Max Nisson. This litigation has resulted from disagreement about the negotiation and sale of Lundy's wholesale produce and food purveying business. Nisson agreed to pay $50,000 cash as a down payment and $300,000 in a non-interest bearing promissory note, payable in $10,000 monthly installments.[1] The plaintiff also agreed to pay an amount equal to the cost of all resalable produce inventory held by Martin & Jones at the closing of the sale. The defendant agreed to deliver financial statements two days prior to closing, and to give complete access to its books and records.

Defendant also made several representations and warranties to the plaintiff with respect to the sale. Defendant agreed to retain both the existing debts (or payables) and receivables of Martin & Jones and to collect the receivables and pay the payables. Indeed, Martin & Jones was to apply any receivables recovered expressly to the payables at the time of the sale. Martin & Jones was to pay the defendant the amount realized on receivables collected in excess of those received and applied to payables.

* Honorable Harry W. Wellford, Senior U.S. Circuit Judge, for the Sixth Circuit, sitting by designation.

1. Two installments were to be in the amount of $20,000.

The parties closed the transaction on December 5, 1987. The defendant, however, failed to produce several of the items required of her under the agreement. The plaintiff agreed to waive the requirement of production of certain documents because he believed that Lundy might not close in a timely fashion if he insisted. At closing, Lundy left in Martin & Jones' safe over $22,000 in negotiable instruments. Despite Nisson's agreement to allow Lundy to recover the money the following day, Nisson deposited it into Martin & Jones' operating account. Nisson withdrew these previously deposited funds two days later and deposited that money into a new Martin & Jones account, which he controlled. Lundy claimed that Nisson used those funds to pay company debts instead of turning them over to her. Nisson never paid the December rent to the defendant, claiming that he used the rent money also to pay Martin & Jones' debts.

Lundy represented that Martin & Jones' current receivables totalled approximately $812,000. Shortly after closing, Nisson realized that a number of these receivables, approximately $88,000, were in fact uncollectible. Lundy also represented that Martin & Jones' current payables totalled approximately $433,000, but the plaintiff soon discovered additional debts amounting to approximately $337,000. At this juncture, the plaintiff felt that the defendant had fraudulently induced him to purchase Martin & Jones.

The plaintiff has collected some $555,000 of the accounts receivable retained by Lundy. He maintains that any further collection of accounts receivable is unlikely. Nisson has used all but $52,000 to pay disclosed and undisclosed liabilities. Nisson has retained the $52,000 because an additional $155,082.46 in liabilities remains outstanding.

The plaintiff has never furnished an accounting as to which accounts he has paid from the receivables and other Lundy sources. Lundy has objected to Nisson's practice of allegedly applying some of the incoming receivables to his company's current debts rather than to pre-existing debts, thereby violating the agreement. Eventually, the defendant collected and retained certain of the accounts receivable owed to Martin & Jones, "reasoning that she had already paid enough." *See* district court Opinion, p. 13. As the district court found, she had paid a number of Martin & Jones' accounts payable from her own funds.

In April, 1988, after the parties' relationship had completely broken down, the United States Department of Agriculture ("USDA") initiated a formal administrative enforcement proceeding against Martin & Jones for repeated violations of the prompt payment provision of the Perishable Agricultural Commodities Act ("PACA"). Although the defendant had been warned several times of the consequences of continued PACA violations, Lundy never notified the plaintiff of such warnings before the sale. The administrative complaint brought by the government sought revocation of Martin & Jones' license, but the plaintiff negotiated a less severe sanction. As a result, the Department of Agriculture agreed only to suspend Martin & Jones' license for thirty days in March, 1989. The plaintiff, however, incurred $4,801.08 in attorney's fees in defending the PACA action. Following notice to the plaintiff of the PACA action to suspend the license, Nisson stopped making payments on the promissory note, leaving a $260,000 balance.

At the time of purchase of Martin & Jones, the plaintiff was a partial owner of another wholesale produce operation known as Fresh World. After the closing, Nisson began to manage both operations from Martin & Jones' space at the Farmers' Market. When Martin & Jones was forced to shut down during March, 1989, due to its suspension of license, Fresh World took over much of the Martin & Jones business. Nisson admitted that he mitigated some of his March loss, but his evidence introduced at trial did not include a gross profit comparison between March, 1988, and March, 1989. Such evidence compared the profits of the entire calendar year 1988 with the calendar year 1989. The plaintiff produced little evidence to explain why the entire calendar year, rather

than the one month the company shut down, was the relevant time used in calculating the resulting damages claimed.[2] In respect to suffering business loss as a result of the March, 1989 suspension, Bank South cancelled its plans to extend a line of credit to Martin & Jones, negotiated by Nisson. The plaintiff never reapplied for the line of credit, nor did he introduce any evidence of damage resulting from the denial of credit.

The plaintiff charged the defendant with violation of (1) § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b); (2) the anti-fraud provision of the Georgia Securities Act of 1973; and (3) Georgia common-law prohibitions against fraud and deceit.[3] Lundy denied most of the assertions and counterclaimed for breach of contract.

The district court found that Lundy had made misrepresentations about the pending federal PACA investigations, and that the plaintiff justifiably relied on the defendant's misrepresentations. Further, the court found that the defendant's misrepresentations proximately caused compensable injury. The district court found also that the defendant was entitled to recover from the plaintiff the balance due on the promissory note ($260,000) and $4,420.00 in prorated rent for December. The district court found, however, that the defendant was not entitled to recover the $22,000 left in the company safe on the day of the closing because that money was not Lundy's personal property, but rather was a receivable or asset to be turned over and applied to payables. Further, the district court found that the defendant was not entitled to a credit for the payables that she paid herself.

The main contention on appeal concerns the amount of damages sustained by Nisson due to the business interruption in March, 1989 (the license suspension period). In the district court's first order dated February 7, 1991, it accepted the plaintiff's evidence as "adequate evidence of consequential damages." Plaintiff claimed to have suffered $348,000 in lost profits which had been proved by comparing Martin & Jones' total profits in 1989 to those in 1988. Lundy filed a motion to amend the court's findings and conclusions on the $348,000 lost profit claim on March 1, 1991, *concededly outside* the ten-day time limitation under Rule 52(b),[4] but within the time for filing an appeal. Because the motion was untimely, the district court treated defendant's motion as one for relief from judgment under Rule 60(b).[5] The district court then amended its findings of fact concerning the plaintiff's lost profit damages, and found that the plaintiff was entitled only to one-twelfth. In its order dated June 21, 1991, the district court stated:

> [P]laintiff's documentary evidence ... and testimonial evidence ... did not include a gross profit comparison between *March,* 1988, and *March,* 1989.... Plaintiff gave no evidence explaining why the calendar year of the one-month shut down was the relevant time unit for calculating the damages that resulted therefrom. (emphasis in original)

Accordingly, the district court adopted the approach urged by the defendant "since it is the most the court could do with plaintiff's limited, but in and of itself sound,

---

**2.** Plaintiff claimed that customer defection resulting from the one month's suspension of license caused a reduction in sales and damages for the entire year. He did not, however, submit evidence to show that such defection was caused by the license suspension.

**3.** Nisson also alleged violations of federal and state RICO statutes, which claims were dismissed early in this case, and are not the subjects of any issues on appeal.

**4.** Fed.R.Civ.P. 52(b) reads in pertinent part:
(b) *Amendment.* Upon motion of a party made not later than *10 days* after entry of judgment, the court may amend its findings or make additional findings and may amend the judgment accordingly.
(emphasis added).

**5.** Fed.R.Civ.P. 60(b) reads in pertinent part:
(b) *Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud; etc.* On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for [mistake, inadvertence, surprise, excusable neglect, etc.]. The motion shall be made within a reasonable time....

evidence of gross profit loss for calendar year 1989." Under that approach, the court held that the plaintiff was entitled to recover "one-twelfth of $348,114, or $29,-009.50."

On July 11, 1991, the plaintiff filed a motion for a new trial or, in the alternative, for a partial new trial on damages. The court denied this motion by order entered on July 26, 1991. The plaintiff filed his notice of appeal on August 8, 1991, and the defendant filed her notice of appeal on August 14, 1991.

The plaintiff argues on appeal first that the district court erred in considering the defendant's untimely Rule 52(b) motion and treating it as a Rule 60(b) motion; second, that the district court erred in reducing lost profits to only $29,009.50; and, finally, that the district court erred in failing to grant a partial new trial on damages. Lundy argues, on the other hand, that in its original order (1) the district court erred in awarding the plaintiff lost profits because of inadequate evidence; and (2) the district court erred in failing to award her damages for the amount of bad debts that the plaintiff claimed and "wrote off" on his own income tax return.

■ The 10–day time limitation for serving a Fed.R.Civ.P. 52(b) motion is jurisdictional and cannot be extended by the district court. *Gribble v. Harris*, 625 F.2d 1173, 1175 (5th Cir. Unit A 1980) (per curiam).[6] If treated as a Rule 52(b) or Rule 59(e) motion, then, Lundy's application for reconsideration or amendment of the court's decision was too late, being filed more than ten days after entry of the February 7, 1991 order. Such motions may, however, be treated as Rule 60(b) motions if grounds stated would be a basis for Rule 60(b) relief. *Oliver v. Home Indemnity Co.*, 470 F.2d 329, 330 (5th Cir.1972); *Glass v. Seaboard Coast Line Railroad Co.*, 714 F.2d 1107, 1109 (11th Cir.1983). *See also Butler v. Pearson*, 636 F.2d 526, 529 (D.C.Cir.1980) (where motion did not state under which rule it was brought, it may be considered as a Rule 60(b) motion if it

states grounds for relief under that rule); *Prop–Jets, Inc. v. Chandler*, 575 F.2d 1322, 1324–1325 (10th Cir.1978) (in interest of justice, Rule 25 motion may be treated as a Rule 60(b) motion).

■ We find no error in the treatment of defendant's motion as a Rule 60(b) motion under the circumstances of this case. Mistakes of judges may be amended under this provision [60(b) ]. *Meadows v. Cohen*, 409 F.2d 750, 752 n. 4 (5th Cir.1969). This broad language seems to include mistakes of fact as well as mistakes of law, notwithstanding the statement in *Oliver* that the rule encompasses mistakes in the application of the law. *Oliver*, 470 F.2d at 329. This court has held that calculation of damages involves essentially a factual determination correctable when found to be "clearly erroneous." *Hiatt v. United States*, 910 F.2d 737, 742 (11th Cir.1990); *Meader v. United States*, 881 F.2d 1056, 1060 (11th Cir.1989).

There is authority that where a district court's mistake was "clear on the record" and involved a "plain misconstruction" of the law and the erroneous application of that law to the facts, " 'compelling policies of basic fairness and equity reflected by 60(b)' " may mandate amendment to "conform its judgment to the law." *Compton v. Alton Steamship Co.*, 608 F.2d 96, 104 (4th Cir.1979) (quoting *Meadows*, 409 F.2d at 753). *Compton* held that Rule 60(b)(6) is a "catch-all" provision, and a "grand reservoir of equitable power to do justice in a particular case." *Id.* at 106–107 (*citing* 7 *Moore's Federal Practice and Procedure* § 60.27[2] at 375). *See also Menier v. United States*, 405 F.2d 245, 248 (5th Cir. 1968); *Radack v. Norwegian America Line Agency*, 318 F.2d 538, 542 (2d Cir. 1963).

■ The district court treated defendant's motion as a Rule 60(b) motion without specifying the subsection upon which it relied to effectuate the substantial change made in lost profits damages during the one month PACA suspension. It may be

---

**6.** The Eleventh Circuit is bound by Fifth Circuit precedent decided before October 1, 1981. *Bon-* *ner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

deemed to have acted under either subsection (1) or the broad provisions of subsection (6). In either event, Rule 60(b) is to be given a liberal and remedial construction. *See Meadows,* 409 F.2d at 752 n. 4; *Sears, Sucsy & Co. v. Insurance Co. of North America,* 392 F.Supp. 398, 411–412 (N.D.Ill.1974); *United States v. Berger,* 86 F.R.D. 713, 714 (W.D.Pa.1980). It is evident the district court found that its original decision and factual determination was not borne out by the greater weight of the evidence, that it had committed error in the damages holding for plaintiff, and that this error was correctable under Rule 60(b). We are persuaded that under these circumstances, the district court had the authority to make an amendment on the sole issue of the amount of plaintiff's damages on his breach of contract/lost profits claim in order to "do justice" in this case.

■ Plaintiff filed, on August 8, 1991, a notice of appeal from the denial of his motion for a new trial or partial new trial as to his damages following the district court's judgment amending the original damage award for plaintiff. Having held that the district court had authority under Rule 60(b) to make the amendment to the original damage award, in the interest of justice we now also conclude that it was an abuse for the district court to deny plaintiff at least a hearing on his motion for a partial new trial. Instead, the district court mechanically divided the plaintiff's yearly loss by twelve in order to arrive at the appropriate amount of damages. In using the annual loss to arrive at an ultimate amount, the district court's procedure was inconsistent with its basic finding that the plaintiff's annual loss is not an accurate reflection of the plaintiff's total loss. By dividing the total loss for 1989 by twelve, the court deemphasized the impact that the license suspension had on March sales. The plaintiff was denied an effective opportunity to show precisely how much of the claimed annual loss was attributable to the month of March. He should, therefore, be afforded the opportunity on the record to argue his contentions about damages to the district court.

We, accordingly, REMAND this case to the district court for further proceedings consistent with this opinion.